10 MAG 2809

◻ ORIGINAL

Approved: _____

HOWARD S. MASTER/ANDREW GOLDSTEIN
Assistant United States Attorneys

Before:   THE HONORABLE HENRY B. PITMAN
          United States Magistrate Judge
          Southern District of New York

- - - - - - - - - - - - - - x

UNITED STATES OF AMERICA          :      **SEALED COMPLAINT**

          - v. -                  :      Violations of
                                         18 U.S.C. §§ 1349,
MARK MAZER,                       :      1956(h)
DIMITRY ARONSHTEIN,
VICTOR NATANZON,                  :      COUNTY OF OFFENSE:
SCOTT BERGER,                            NEW YORK
SVETLANA MAZER, and               :
LARISA MEDZON,
                                  :
          Defendants.
- - - - - - - - - - - - - - x

SOUTHERN DISTRICT OF NEW YORK, ss.:

          ROBERT RYAN, being duly sworn, deposes and says that he
is a Criminal Investigator with the United States Attorney's
Office for the Southern District of New York ("USAO"), and
charges as follows:

COUNT ONE

          1.   From at least in or about 2005, up to and
including December 2010, in the Southern District of New York and
elsewhere, MARK MAZER, DIMITRY ARONSHTEIN, VICTOR NATANZON, and
SCOTT BERGER, the defendants, and others known and unknown,
unlawfully, willfully and knowingly did combine, conspire,
confederate, and agree together and with each other to commit an
offense against the United States, to wit, to violate Title 18,
United States Code, Section 1343.

          2.   It was a part and an object of the conspiracy that
MARK MAZER, DIMITRY ARONSHTEIN, VICTOR NATANZON, and SCOTT
BERGER,  the defendants, and others known and unknown,
unlawfully, willfully and knowingly, having devised and intending
to devise a scheme and artifice to defraud, and for obtaining
money and property by means of false and fraudulent pretenses,
representations and promises, would and did transmit and cause to

be transmitted by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, in violation of Title 18, United States Code, Section 1343.

## OVERT ACTS

3.   In furtherance of said conspiracy and to effect the illegal object thereof, the following overt acts, among others, were committed in the Southern District of New York and elsewhere:

a.   In or about September 2006, MARK MAZER, the defendant, submitted fraudulent Vendor Information Exchange System ("VENDEX") questionnaire responses to the City of New York in New York, New York.

b.   In or about early 2007, DIMITRY ARONSHTEIN, the defendant, while in New York, New York, directed a consultant working on the CityTime software development project (the "CityTime Project") to sign fraudulent timesheets falsely certifying that he/she had worked for 80 hours over a two-week period, when, in fact, the consultant had been terminated.

c.   In or about the spring of 2007, VICTOR NATANZON, the defendant, while in New York, New York, directed a consultant working on the CityTime Project to sign fraudulent timesheets falsely certifying that he/she had worked for 80 hours over a two-week period, when, in fact, the consultant had been terminated.

d.   On or about July 20, 2007, MARK MAZER, the defendant, approved a fraudulent time sheet submitted by a consultant working on the CityTime Project and caused it to be submitted for payment.

e.   On or about July 20, 2007, SCOTT BERGER, the defendant, approved a fraudulent time sheet submitted by a consultant working on the CityTime Project and caused it to be submitted for payment.

(Title 18, United States Code, Section 1349.)

## COUNT TWO

4.   From at least in or about 2005 up to and including in or about December 2010, in the Southern District of New York and elsewhere, MARK MAZER, DIMITRY ARONSHTEIN, VICTOR NATANZON,

SVETLANA MAZER, and LARISA MEDZON, the defendants, and others known and unknown, unlawfully, willfully and knowingly did combine, conspire, confederate, and agree together and with each other, to violate United States Code, Sections 1956(a)(1)(A)(i), 1956(a)(1)(B)(i), and 1957(a).

5.   It was a part and an object of the conspiracy that MARK MAZER, DIMITRY ARONSHTEIN, VICTOR NATANZON, SVETLANA MAZER, and LARISA MEDZON, the defendants, and others known and unknown, in an offense involving and affecting interstate and foreign commerce, knowing that the property involved in certain financial transactions, to wit, cash and wire transfers, represented the proceeds of some form of unlawful activity, unlawfully, willfully, and knowingly would and did conduct and attempt to conduct such financial transactions which in fact involved the proceeds of specified unlawful activity, to wit, the proceeds of the wire fraud conspiracy charged in Count One, with the intent to promote the carrying on of specified unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(1)(A)(i).

6.   It was further a part and object of the conspiracy that MARK MAZER, DIMITRY ARONSHTEIN, VICTOR NATANZON, SVETLANA MAZER, and LARISA MEDZON, the defendants, and others known and unknown, in an offense involving and affecting interstate and foreign commerce, knowing that the property involved in certain financial transactions, to wit, cash and wire transfers, represented the proceeds of some form of unlawful activity, unlawfully, willfully, and knowingly would and did conduct and attempt to conduct such financial transactions which in fact involved the proceeds of specified unlawful activity, to wit, the proceeds of the wire fraud scheme charged in Count One, knowing that the transactions were designed in whole and in part to conceal and disguise the nature, the location, the source, the ownership and the control of the proceeds of specified unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i).

7.   It was further a part and object of the conspiracy that MARK MAZER, DIMITRY ARONSHTEIN, SVETLANA MAZER, VICTOR NATANZON, and LARISA MEDZON, the defendants, and others known and unknown, within the United States and involving United States persons, in an offense involving and affecting interstate and foreign commerce, unlawfully, willfully, and knowingly would and did engage and attempt to engage in monetary transactions in criminally derived property of a value greater than $10,000 that is derived from specified unlawful activity, to wit, the proceeds

of the wire fraud scheme set forth in Count One, in violation of
Title 18, United States Code, Section 1957(a).

OVERT ACTS

8.    In furtherance of said conspiracy and to effect
the illegal objects thereof, the following overt acts, among
others, were committed in the Southern District of New York and
elsewhere:

a.    On or about May 2, 2006, DIMITRY ARONSHTEIN,
the defendant, wire transferred $30,750.90 in fraud proceeds to a
Latvian bank account via New York, New York.

b.    On or about January 22, 2010, LARISA MEDZON,
the defendant, withdrew over $6000 in cash via multiple ATM
transactions at multiple banks in New York.

c.    In or about June 2010, VICTOR NATANZON, the
defendant, wrote a $43,000 check to a shell company maintained by
LARISA MEDZON, the defendant, to facilitate the scheme described
herein.

d.    On or about March 26, 2009, MARK MAZER, the
defendant, received a $30,000 wire transfer from a bank account
in Latvia via New York, New York to a bank account in the name of
a shell company that he owns.

e.    In or about June 2010, SVETLANA MAZER, the
defendant, submitted fraudulent VENDEX questionnaire responses to
the City of New York in New York, New York to facilitate the
crime described herein.

(Title 18, United States Code, Section 1956(h).)

The bases for deponent's knowledge and for the
foregoing charges are, in part, as follows:

9.    I am a Criminal Investigator with the United
States Attorney's Office for the Southern District of New York,
and have been in that position for over 3 years.  Previously, I
was a Special Agent with the U.S. Department of Housing and Urban
Development-Office of the Inspector General ("HUD-OIG") for 3
years, and prior to that I was a Special Agent with Internal
Revenue Service - Criminal Investigation ("IRS-CI") for 14 years.
While with the USAO, HUD-OIG, and IRS-CI, I have participated in
multiple investigations of fraud and money laundering offenses.
I am familiar with the facts and circumstances set forth below

from my participation in the investigation of this case, from my personal knowledge, and from my conversations with other law enforcement officers and others.  Because this Affidavit is being submitted for the limited purpose of establishing probable cause, I have not included every fact I have learned during the investigation.  Where the actions, statements and conversations of others are recounted herein, they are related in substance and in part, unless otherwise indicated.

10.    I have spoken with investigators with the New York City Department of Investigation ("DOI"), which has been conducting an investigation into the activities of MARK MAZER, DIMITRY ARONSHTEIN, VICTOR NATANZON, SCOTT BERGER, SVETLANA MAZER, and LARISA MEDZON, the defendants, among others, in connection with an information technology ("IT") project funded by the City of New York (the "City") called the CityTime Project ("CityTime"), which is intended to introduce a new, more efficient and effective timekeeping system for City employees. During the investigation, DOI has gathered evidence, including but not limited to municipal, corporate, and financial records, witness statements, and electronic evidence, and analyzed and summarized that evidence.  The information set forth below, except where specifically indicated, is based on my review of relevant evidence and analyses obtained or conducted by DOI and my discussions with DOI investigators who gathered and analyzed the evidence.

## Overview of the Scheme

11.    As set forth in greater detail below, based on evidence gathered by DOI over the course of the investigation, there is probable cause to believe that defendants MARK MAZER, DIMITRY ARONSHTEIN, VICTOR NATANZON, and SCOTT BERGER, the defendants, have participated in a concealed kickback scheme that is still under investigation, but that to date is known to involve over $80 million in City funds that have been paid to CityTime contractors owned by MARK MAZER, BERGER, ARONSHTEIN, and NATANZON.  Proceeds of the scheme were laundered through shell corporations established by MARK MAZER and his wife, SVETLANA MAZER, and mother, LARISA MEDZON, among others.  Following is a summary overview of the roles and responsibilities of the various defendants in the components of the scheme, as well as benefits enjoyed by participants in the scheme:

a.    MARK MAZER, through a consulting firm that he owned, received over $4.4 million in City money for work that he and subcontractors paid through his company did to purportedly supervise consultants working on the CityTime project.  Although

MARK MAZER had no formal position at OPA, he had significant authority and access within OPA, including direct access to the Executive Director, and the authority to, among other things, help shape and approve contract amendments and work orders that resulted in higher staffing levels on the CityTime project.

b.   At the same time that MARK MAZER was approving staffing increases, he was steering the new business to consulting firms run by ARONSHTEIN, who is believed to be MARK MAZER's relative, and NATANZON.  The business steered to ARONSHTEIN's company represented almost 100% of the fees generated by ARONSHTEIN's company, and the fees steered to NATANZON's company represented over 75% of the fees generated by NATANZON's company.  The consulting firms collectively were paid over $76 million in City funds.  They secretly kicked back over $24.5 million of that $76 million directly to shell companies linked to MARK MAZER, and MARK MAZER received over $1 million in foreign wires that, based on my training and experience, are characteristic of international laundering transactions.  Thus, bank records collected during the investigation establish that MARK MAZER received as a kickback approximately 1/3 of the City funds paid to ARONSHTEIN and NATANZON.  MARK MAZER also aided in laundering the proceeds of the scheme.  MARK MAZER received those kickbacks while he was supposed to, on the City's behalf, be supervising the development of the CityTime project.

c.   In what I believe represented an effort to generate additional proceeds from the kickback scheme, MARK MAZER, ARONSHTEIN, NATANZON, and BERGER generated and approved for payment fraudulent timesheets for consultants who were paid by the City through the corrupt contractors.  Over $200,000 in fraudulent timesheets were identified based on review to date of only a small fraction of total timesheets submitted in connection with the project.

d.   SVETLANA MAZER and MEDZON, among others, created and routed fraud proceeds through two layers of shell corporations, using sophisticated means to conceal the illegal origin of the millions of dollars in illegal funds routed through accounts that they held or controlled.

e.   MARK MAZER, the defendant, took several steps to conceal the existence of the scheme, including submitting fraudulent Vendor Information Exchange System ("VENDEX") questionnaire responses to the City that failed to disclose, among other things, his interest in shell companies receiving proceeds of the fraud.  SVETLANA MAZER, the defendant, also submitted fraudulent VENDEX responses to conceal the existence of

the scheme and her role in the scheme.  Moreover, MARK MAZER provided false information about his connection to ARONSHTEIN, failing to disclose to the City that he had a familial relationship with ARONSHTEIN, among other things.

   f. The defendants have been handsomely rewarded for their participation in the scheme.  Among other things, financial and public agency records analyzed to date have identified the following:

    i. MARK MAZER and SVETLANA MAZER have purchased two homes with almost $3 million in fraud proceeds and paid for home renovations with more than $350,000 in additional proceeds.  They have also purchased 6 late-model cars in the past two years, and placed well over $1 million in accounts held in their names, their children's names, and in the names of accounts that they control through shell corporations.  They also received more than $1 million in foreign wires that appear to be linked to ARONSHTEIN.

    ii. ARONSHTEIN obtained over $55 million in City money for his corporation, which previously had no apparent clients.  From among those proceeds, he transferred over $1 million in proceeds to his personal bank account, obtained $425,000 in cash and ATM withdrawals, and sent over $500,000 to other corporations owned by ARONSHTEIN and/or his wife.  ARONSHTEIN also purchased 2 new late-model cars in the past two years.

    iii. NATANZON obtained over $21 million in City money for contracts for his corporation as a result of the kickback scheme, and obtained over $400,000 in proceeds from the scheme.

    iv. BERGER received over $1.3 million from MAZER's and ARONSHTEIN's firms for his role in the scheme.

    v. MEDZON obtained over $1.5 million in accounts in her name or that she controls through shell corporations.

### Background of the Investigation

**A. The CityTime Project**

   12. CityTime is a project administered by the City's Office of Payroll Administration ("OPA").  The project was initiated in or about 1998.  The purpose of the project,

according to OPA, was to develop an automated timekeeping system that would enable the City's employees to get paid more accurately, more efficiently, and more securely. The current lead software developer on the project (the "Lead Software Developer") assumed responsibility for the project in 2002. The initial contract for development of CityTime was approximately $63 million, with the entire project estimated to cost that amount to complete. Initially, the project was intended to be fully completed by June 2010, to serve approximately 180,000 users at 81 City agencies, and to save close to $30 million per year in increased efficiencies. In addition, the project was expected to save money by deterring fraud through use of biometric scanners and other devices that would record time actually spent by City employees at work.

13. As indicated by public sources of information, in 2001, OPA contracted with a national consulting firm (the "QA Vendor") to provide quality assurance ("QA") services for the CityTime project. The intended purpose of the QA contract was for the QA Vendor to supervise the Lead Software Developer's performance and to ensure that the ultimate product created by the Lead Software Developer would meet the City's needs. The QA Vendor's contract was initially for three years, worth approximately $3.4 million, and subject to five, one-year renewals by the City.

14. Soon after the QA Vendor entered into the QA contract with the City, the contract was amended to permit OPA to retain the services of subject-matter experts ("SMEs"), through the QA Vendor, to assist with active day-to-day management of the CityTime project. Overall, since 2001 there have been 11 amendments to the contract, and payments to the QA Vendor have exceeded $49 million.

15. The cost of the software development project has expanded dramatically as well. While the initial Lead Software Developer contract to develop CityTime was for $63 million, the current amount issued to the Lead Software Developer for CityTime-related services was over $628 million as of September 2010. Moreover, as of June 2010, only 35 percent of the intended user population, which by then had been reduced to 165,000 from 180,000, was using the CityTime system.

B. **VENDEX and Monitoring of City Contractors**

16. The City monitors certain contractors receiving City funds pursuant to requirements set forth in New York City Administrative Code § 6-116.2. As interpreted by the City, that

8

statute requires a contractor and its principals to complete questionnaires requesting a variety of information, if the contractor has "contracts or subcontracts [with the City]: 1. valued at $100,000 or more; 2. that are sole source contracts valued at $10,000 or more and/or; 3. whose aggregate business with the City in the preceding 12 months totals $100,000 or more."[1]  The required contractor reports are aggregated and maintained in a system called the Vendor Information Exchange System ("VENDEX") by the Mayor's Office of Contract Services ("MOCS").[2]

17.  A contractor fitting the above description must complete VENDEX questionnaires that, among other things, require the contractor to identify its principal office address and primary place of business; whether it has been a subcontractor on any contract with the City, and if so, with what contractor; and its principal owners' and officers' names.  A principal owner or officer of a contractor is also required to complete a VENDEX "Principal Questionnaire" that, among other things, requires the principal to identify whether he/she, within the past three years, has been a principal owner or officer of any entity other than the submitting contractor, and if so, to list the names and mailing addresses of the entities and the principal's title(s) with the entities.

18.  VENDEX questionnaires must be sworn under oath and notarized.  They require a submitting principal to verify, among other things, that he/she "supplied full and complete responses to each item therein to the best of [his/her] knowledge, information and belief," and that he or she "understand[s] that New York City will rely on the information supplied in this questionnaire as an inducement to enter into a contract with a submitting vendor."

### The Concealed Kickback Scheme

**A.    Overt Roles with CityTime**

---

[1] "Vendor's Guide to Vendex," available at http://www.nyc.gov/html/selltonyc/pdf/vendors_guide_to_vendex_2006.pdf.

[2]  Other contractors not fitting the above description may be required by the City to complete VENDEX questionnaires at the City's discretion.

19.   I know from reviewing records submitted by the QA Vendor to the City for work performed in connection with CityTime that the QA Vendor billed for time worked by MARK MAZER, the defendant, on the CityTime project beginning in or about 2004. MARK MAZER was described by the QA Vendor in the invoices as an SME. For example, in an invoice dated January 15, 2010, the QA Vendor billed for 150 hours purportedly worked on the CityTime project by MARK MAZER from November 29, 2009, to December 26, 2009, at a rate of $210 per hour, for a total of $31,500.   SCOTT BERGER, the defendant, was also a SME whose time was billed for by the QA Vendor.   In the same January 15, 2010, invoice, the QA Vendor billed for 146.5 hours purportedly worked by BERGER, at a rate of $178.50 per hour, for a total of $26,150.25.

20.   I know further from reviewing records obtained from the QA Vendor, and from a review of information maintained by the VENDEX system, that MARK MAZER, the defendant, was paid by the QA Vendor for work performed on CityTime, not as an employee of the QA Vendor, but through a company called "MS Creative Technologies, Inc." ("MS Creative").   As a subcontractor to the QA Vendor on the CityTime project who had more than $100,000 per year in aggregate business with the City,  MS Creative was required to complete a VENDEX questionnaire.  An MS Creative Questionnaire was completed by MARK MAZER on September 5, 2006. On the questionnaire, MARK MAZER listed himself as the President of MS Creative, and indicated that his home address at the time in Manhasset, New York (the "Mazer Home Address-1") was also the primary place of business for MS Creative.  That same day, MARK MAZER also completed a VENDEX principal questionnaire in his capacity as MS Creative President.  In that questionnaire, MAZER indicated that during the past three years, he had been a principal owner or officer of only one entity other than MS Creative, an entity called "MS Properties, LLC" ("MS Properties"), which was also headquartered at the Mazer Home Address-1.

21.   I have learned that even though MARK MAZER and SCOTT BERGER, the defendants, were not employed by OPA, they exercised significant actual authority over the CityTime project. This authority included identifying additional work that needed to be performed, approving contract amendments and work orders and, as described in greater detail below, certifying the accuracy of timesheets submitted by consultants for payment by the City.   Information leading to this determination includes the following:

a.   I have spoken with DOI Investigators who interviewed several City employees, and have reviewed recordings

of certain of these interviews.  In these interviews, multiple City employees, including a City employee who served as OPA's manager for the CityTime project (the "OPA CityTime Manager") stated that for the past several years, MARK MAZER, the defendant, has reported directly to OPA's Executive Director (the "OPA Executive Director"), rather than to the QA Vendor's management or to the OPA CityTime Manager, even though he was paid to work on the CityTime project as a consultant for the QA Vendor.  City employees also stated that, in this capacity, MARK MAZER had influence over the scope and size of contracts and work orders for work to be performed by the Lead Software Developer on the CityTime project.  Several of these employees also identified BERGER as MARK MAZER's associate who stood in for MARK MAZER at meetings, for required time sheet approvals, and other matters.

b.    I have reviewed meeting minutes of project status update meetings for the CityTime project that were prepared by the QA Vendor.  In these meeting minutes, MARK MAZER, the defendant, was characterized as appearing not as a representative of the QA Vendor, but as a representative of OPA. These meeting minutes further indicate that one of the purposes of the project status update meetings was for the Lead Software Developer and the QA Vendor to report to the OPA Executive Director, the OPA CityTime Manager, and MARK MAZER concerning the status of, and any issues associated with, the CityTime Project. In addition, DOI has reviewed work orders staffed by consultants who were supervised by MARK MAZER; those work orders are described as "OPA-Directed" work orders.

c.    I have reviewed emails obtained from an email account that was provided to MARK MAZER, the defendant, by OPA. In these emails, MARK MAZER was asked to review and approve contract extensions and work orders for the CityTime project, including extensions and work orders for work to be performed by the Lead Software Developer.  Several emails related to the contractual approval process were sent from an OPA email account, issued to MARK MAZER, that was sent from a computer in New York to email accounts belonging to consultants, including consultants with the Lead Software Developer, who use corporate email accounts that are located in California and New Jersey. Accordingly, I submit that email communications made in connection with the amendment and work order approval process included interstate wire communications.

22.    I have learned the following concerning the expenditure of City funds on the CityTime Project:

      a.    In or about December 2003, the City agreed to a contract amendment with the Lead Software Developer, which had taken over the project in 2002, authorizing the expenditure of up to $114.6 million on the CityTime project.

      b.    In or about 2005 and 2006, OPA began approving work orders for additional work, beyond the scope of the December 2003 contract amendment, reportedly required to be performed by the Lead Software Developer in order to enable the successful completion of the CityTime project.  In January and February 2006, the City agreed to contract amendments with the Lead Software Developer authorizing the expenditure of more than $100 million additional City funds, a total of $224.7 million, on the Lead Software Developer's responsibilities related to the CityTime project.

      c.    Invoices for the CityTime project submitted by the Lead Software Developer indicate that the number of individuals for whom the Lead Software Developer billed hours purportedly worked on the CityTime project increased dramatically in 2005 and 2006 in connection with these new work orders and contract amendments.  The size of the Lead Software Developer's bills to the City increased dramatically as well.  For example, in January 2005, the Lead Software Developer submitted a $255,772 bill to the City for work performed on the CityTime Project.  In November 2006, by contrast, the Lead Software Developer submitted bills totaling over $5 million.

      d.    This increased billing caused the dramatic increase in total contract payments to the Lead Software Developer described above.  Invoices reflect that, while total billings by the Lead Software Developer did not reach $100 million until April 2006, four years after it began working on the project, it took only 13 more months for Lead Software Developer billings to reach $200 million (in May 2007), and only 12 more months for billings to reach $300 million (in May 2008).  Over $300 million in additional bills have been submitted by the Lead Software Developer since May 2008.

      e.    Emails obtained from the OPA email account of MARK MAZER, the defendant, indicate that MARK MAZER personally approved various aspects of the additional work orders and contract amendments resulting in the significantly increased staffing levels on the CityTime project.

      f.    The OPA CityTime Manager informed DOI that, among other things, MAZER was involved in shaping the scope and

requirements of the additional work orders and contract amendments in 2005 and 2006.

23.   DOI learned from information maintained by VENDEX, from documents obtained from the Lead Software Developer, and from interviews with City employees, that an information technology contractor ("Contractor-1") served as a subcontractor to the Lead Software Developer for the project, and in that capacity provided consultants to the Lead Software Developer for use in completing tasks set forth in the new work orders and contract amendments.   These records reflect that, among other things, on January 9, 2006, Contractor-1 sent a facsimile from Contractor-1's offices in New Jersey to an employee of the Lead Software Developer located in New York, including a copy of the subcontract between the Lead Software Developer and Contractor-1.

**B.   Operation of the Kickback and Laundering Scheme**

**1.   Discovery of the Scheme**

24.   In or about June 2010, DOI received information from a former consultant on the CityTime project ("Consultant-1"), whose time had been billed to the City by the Lead Software Developer.   Consultant-1 informed DOI that he/she was not paid by the Lead Software Developer or Contractor-1; instead, a company called "DA Solutions, Inc." ("DAS") issued Consultant-1's paychecks.   Consultant-1 provided a copy of a paystub from DAS to DOI.   DOI determined that DAS was not listed in VENDEX as a subcontractor of the Lead Software Developer, nor was any contractual information concerning DAS's right to payment from the CityTime project available to DOI.

25.   Following this discovery, DOI interviewed several OPA employees concerning DAS and learned the following, in substance and in part:

a.   The OPA CityTime Manager informed DOI that another SME ("SME-1"), who interacted with MARK MAZER, the defendant, on the CityTime project, told him/her in or about 2005 that MARK MAZER had proposed to hire an additional consulting firm aside from Contractor-1 to provide staffing for the new work orders and amendments, in order to make sure that Contractor-1 was offering competitive rates.   SME-1 further informed him/her that MARK MAZER claimed to have identified DAS as the appropriate competitor when he struck up a conversation with a principal of DAS on the street and realized based on this conversation that

DAS would be a good competitor for Contractor-1.[3]  The OPA
CityTime Manager further informed OPA that after he/she heard
about DAS from SME-1, the Lead Software Developer's CityTime
Project Manager ("Developer Project Manager") stated at a meeting
that the Lead Software Developer did not want direct dealings
with DAS, and that if DAS was to do work on the project, it would
have to be as a subcontractor to Contractor-1.

      b.    An OPA human resources manager ("OPA HR
Manager") who had responsibilities associated with consultants
assigned to the CityTime project stated that in or about 2005,
the OPA Executive Director informed him/her that MARK MAZER, the
defendant, would be bringing some consultants to him/her that
would be doing work on the CityTime Project.  Soon thereafter,
MARK MAZER came to him/her and introduced DIMITRY ARONSHTEIN and
VICTOR NATANZON, the defendants, as principals of consulting
firms who would be bringing consultants to the OPA HR Manager to
be approved for work on the CityTime project.  The OPA HR Manager
reported that following this introduction, ARONSHTEIN identified
DAS as his company, and NATANZON identified a company called
"Prime View, Inc." ("Prime View") as his company.  Both
ARONSHTEIN and NATANZON began contacting the OPA HR Manager by
phone and email seeking approval for numerous consultants to be
hired by DAS and Prime View (collectively, the "Sub-
Subcontractors") to work on the CityTime Project.[4]  Prime View is
also not listed on VENDEX.

      c.    Numerous CityTime consultants who were
interviewed in connection with the investigation into false
timesheets submitted on behalf of people who were not working on
the CityTime project, described in greater detail below, stated
that they were employed by either DAS or Prime View, rather than
by the Lead Software Developer or Contractor-1.

     26.  This discovery, among other things, led to the
investigation described herein.  The evidence uncovered during

---

   [3] For reasons set forth below, I know this statement to have
been false, as ARONSHTEIN, the principal of DAS, is believed to
be MARK MAZER's relative, and as both had financial dealings with
each other prior to DAS's first dealings with the CityTime
project.

   [4] Because the Sub-Subcontractors had no contract with the
City, and were not direct subcontractors to the Lead Software
Developer, they had no obligation to complete VENDEX
questionnaires.

the investigation, which is still ongoing, has led me to conclude the following, based on my training and experience as a Criminal Investigator with the USAO and a former IRS-CI Special Agent:

a.   MARK MAZER, the defendant, has abused his position of authority at OPA, and his contractual obligations as a SME to ensure that the Lead Software Developer is performing efficiently and effectively, to covertly steer over $76 million in City funds to subcontractors who were related to him by family or through corrupt financial arrangements.  MARK MAZER did so, even while MS Creative, MARK MAZER's company, took in more than $4.4 million to supervise the activities of the Lead Software Developer and its subcontractors.  Thus, at least $80 million in funds spent on CityTime thus far has been tainted by the fraud described herein.

b.   MARK MAZER steered the funds to the Sub-Subcontractors because he had made arrangements with DIMITRY ARONSHTEIN and VICTOR NATANZON, the defendants, who serve as principals of those entities, to have them kick back at least $25 million of the $76 million given to the Sub-Subcontractors in a manner that enabled MARK MAZER and his family members, among others, to use the money without detection by law enforcement, and to provide continued incentive for MARK MAZER to continue recommending to the City, in his capacity as SME with direct access to the OPA Executive Director, additional work to be completed by the Sub-Subcontractors, and to continue using the Sub-Subcontractors as providers of consultants to perform that additional work.

c.   SVETLANA MAZER and LARISA MEDZON, the defendants, facilitated the laundering of the millions of dollars of fraud proceeds being routed from the Sub-Subcontractors and related sources by maintaining dozens of bank accounts, at multiple banks, in the names of multiple layers of shell corporations whose only real purpose was to receive and facilitate distribution of fraud proceeds via cash withdrawals, wire transfers, checks, and other means.   These defendants withdrew hundreds of thousands of dollars in cash from various bank accounts, or engaged in other transactions, to further conceal and permit undetected distribution of proceeds of the fraud.

d.   SCOTT BERGER, the defendant, also abused his authority as a SME to supervise the work of the Lead Software Developer, a position for which he received almost $1 million in overt income, by facilitating the fraud described herein, and by accepting over $400,000 in payments from DAS.

e.    As set forth below, one manifestation of the corrupt interests of ARONSHTEIN, NATANZON, MARK MAZER, and BERGER in secretly maximizing City expenditures via the Sub-Subcontractors for their own benefit, rather than safeguarding City funds, was in their efforts to prepare and submit fraudulent timesheets in the names of Sub-Subcontractor employees for payment by the City, described in greater detail *infra*.

27.    The existence of the scheme to defraud, and to launder the proceeds of the fraud, is demonstrated by, among other things:

a.    The complex, undisclosed financial and corporate structures established to receive funds routed through the Sub-Subcontractors;

b.    Efforts by participants in the scheme to misrepresent or conceal their interests in these structures, and in the proceeds of the scheme;

c.    Efforts of participants in the scheme to route tens of millions of dollars of fraud proceeds through these complex structures in a manner that would avoid scrutiny by the City and by law enforcement, and that would facilitate the ongoing continued operation of the scheme;

d.    The overt efforts by several participants in the scheme to defraud the City by causing false timesheets to be prepared and submitted to the City for payment through the structures described above.

## 2.    <u>Financial and Corporate Structures Used to Perpetrate the Scheme</u>

28.    The following is a summary of relevant aspects of the flow of City funds to the defendants and the corporate and financial structures used to receive the funds:

a.    The City paid the Lead Software Developer and the QA Vendor from a bank in New York, New York, by Electronic Funds Transfer ("EFT"), a form of wire transfer.  I am also aware of multiple additional wire transfers involving proceeds of the scheme, including wire transfers involving banks located in New Jersey that were held in the name of Contractor-1 and VICTOR NATANZON, the defendant.  Participants in the scheme then extracted funds from the accounts that were receiving proceeds, on multiple occasions employing interstate wires to accomplish

16

this goal.  For example, bank records reflect that on or about May 24, 2010, NATANZON withdrew $400 from his Prime View bank account, which contained proceeds of the scheme, using an ATM located in East Windsor, New Jersey.  I know, based on my training and experience, that the ATM transaction would have had to employ interstate wire communications to enable the $600 to be withdrawn from NATANZON's New Jersey bank account in this manner.  Accordingly, I submit that interstate wires were used to facilitate the scheme described herein, and to enable the distribution of proceeds of the scheme.

       b.    Once the money was received from the City, the Lead Software Developer paid Contractor-1 a portion of the money it obtained from the City.  Contractor-1 would then issue checks to the Sub-Subcontractors.

       c.    The Sub-Subcontractors received over $76 million in payments by check from Contractor-1 between mid-2005 and 2010: over $55 million was received by DAS, and over $21 million was received by Prime View.

       d.    Almost 100% of the money deposited into DAS's bank accounts during the operation of the scheme came from Contractor-1.  DAS's accounts reflect the following:

       i.    Only approximately $12 million of the more than $55 million deposited into DAS's accounts from Contractor-1 -- i.e., only approximately 20 percent of the total amount received by DAS -- was sent to a payroll service provider for payment to DAS employees or payroll tax-related services.[5]

       ii.    Over $3.5 million of the funds were wired to numerous foreign bank accounts, primarily in amounts of larger than $10,000.[6]  For example, on May 2, 2006, ARONSHTEIN wire transferred $30,750.90 to the Latvian bank account of a company purportedly based in Oklahoma City, Oklahoma (the "Latvian Account-1").  I know from my training and experience, and from review of records maintained by the correspondent bank that routed the wire to Latvia, that international wires sent to the Latvian Account-1 from the United States were routed through New York, New York.

---

[5] Additional funds could have been paid as compensation to individuals working through other corporate entities, rather than through the payroll service provider.

[6] These foreign wires are discussed in greater detail below.

       iii. Over $1 million was transferred to accounts in the name of ARONSHTEIN.  More than $400,000 in additional funds were withdrawn in cash.  More than $500,000 in additional money was transferred to corporate accounts that DOI learned, from examination of corporate and other Government records, are owned by ARONSHTEIN or his wife.

       e.   Over 75% of the money deposited into Prime View's bank accounts during the operation of the scheme came from Contractor-1.  Based on a preliminary review of a portion of the accounts maintained by Prime View and/or NATANZON, and of Government records related to entities controlled by NATANZON or his wife, Prime View's accounts reflect the following:

       i.    At least over $300,000 in transfers to accounts controlled by NATANZON and/or his wife; and

       ii.  At least $100,000 in cash and ATM withdrawals.

       f.   Of the $76 million deposited into the Sub-Subcontractors' Accounts, over $24.5 million was deposited in accounts held in the name of three companies, "MAS Solutions, Inc." ("MAS"); SJM Services, Inc. ("SJM"), and Front Line Consulting Corp." ("Front Line") (collectively, the "First-Tier Shells"):

       i.   $10.8 million was deposited in bank accounts held in the name of MAS;

       ii.  $5.5 million was deposited in bank accounts held in the name of SJM; and

       iii. $8.1 million was deposited in bank accounts held in the name of Front Line.

       g.   Bank records for the First-Tier Shells reflect that the entities incur no business expenses, and have no source of income other than payments from the Sub-Subcontractors. While the dozens of accounts held in the names of these shells are still being identified and analyzed, of the $24.5 million deposited into the First-Tier Shells, over $250,000 was withdrawn in close to 500 ATM withdrawals of $500 to $1,000, made at regular intervals, and over $2.3 million was withdrawn in checks to cash or cashiers' checks.  In addition, over $2 million remains in accounts held in the names of shell corporations for which MEDZON has signatory authority.  In addition, more than $1

million was transferred to bank accounts held in the name of MEDZON and her husband.

      h.  Over $5 million of the money from the First-Tier Shells was deposited into accounts in the name of additional companies that appear, based on my training and experience, to be established solely to receive funds from the First-Tier Shells or from other entities, and to route the funds to MARK MAZER, SVETLANA MAZER (MARK MAZER's wife), and LARISA MEDZON (MARK MAZER's mother), the defendants, among others. These companies include entities named MS Advantage Group, LLC ("MS Advantage") and MS Development Services Corp. ("MS Development") (collectively, the "Second-Tier Shells").

      i.  Substantially all of the funds deposited into the Second-Tier Shells were routed to MARK MAZER, SVETLANA MAZER, LARISA MEDZON, and to accounts held in the name of the children of MARK MAZER and SVETLANA MAZER. Among the funds transferred to these individuals are over $880,000 transferred from MS Advantage and MS Development to accounts held directly by MARK MAZER, SVETLANA MAZER, or their children. Several hundred thousand dollars of fraud proceeds remain in the Second-Tier Shell accounts.

      29.  I have learned from reviewing corporate records related to the First- and Second-Tier Shells that all five of the shell corporations described herein were incorporated by the same individual, who is located in Brooklyn, New York (the "Incorporator"). I have learned the following about corporate and bank account information related to the First-Tier Shells and the Second-Tier Shells:

      a.  First-Tier Shells:

      i.  SJM was incorporated on November 18, 2005. No name other than the Incorporator's is listed on the Certificate of Incorporation. Incorporation documents indicate that SJM's mailing address is an address in East Rockaway, New York (the "East Rockaway Address"). Bank records indicate that LARISA MEDZON, the defendant, is the sole signatory on SJM's bank accounts. Bank account statements for SJM are mailed to an address that DOI has identified as MEDZON's home address. SJM has at least 4 different bank accounts at 3 different banks.

      ii.  MAS was incorporated on April 5, 2006. No name other the Incorporator's is listed on the Certificate of Incorporation. Incorporation documents indicate that MAS's mailing address is an address associated with a private mailbox

facility in Roslyn Heights, New York.  Bank records for MAS list
the same mailing address, although records for one of the bank
accounts were mailed to DAS in New York, New York.  A co-
conspirator not named herein ("CC-1") is listed as the sole
signatory on MAS's bank accounts.  MAS has at least 8 different
bank accounts at 5 different banks.

        iii.  Front Line was incorporated on May 18,
2007.  No name other than the Incorporator's is listed on the
Certificate of Incorporation.  However, in a biennial statement
submitted on behalf of Front Line in or about May 2009, MEDZON,
the defendant, listed herself as the Chief Executive Officer of
the corporation, with a mailing address associated with a home in
Manhasset, New York that I know from public records to have been
purchased in cash by MARK and SVETLANA MAZER for $1.2 million in
2009 (the "Mazer Home Address-2").  Incorporation documents
indicate that Front Line's mailing address is an address
associated with a private mailbox facility in Manhasset, New
York.  Bank records list the same mailing address.  Bank records
indicate that MEDZON is the sole signatory on Front Line's bank
accounts.  Front Line has at least 7 different bank accounts at 4
different banks.

    b.   Second-Tier Shells:

        a.   MS Development was incorporated on July
10, 2006.  MARK MAZER, the defendant, is listed as the Vice-
President of MS Development in incorporation documents, while
SVETLANA MAZER, the defendant, is listed as the President of the
company.  MS Development's mailing address is the Mazer Home
Address-1 -- i.e., the address that was listed on MS Creative's
VENDEX Questionnaire as the business address of MS Creative.
Bank records list the same mailing address.  Bank records
indicate that MARK MAZER and SVETLANA MAZER have signatory
authority over the MS Development bank accounts. MS Development
has at least 2 different bank accounts at 2 different banks.

        e.   MS Advantage was incorporated on July 11,
2006, the day after MS Development was incorporated.  MARK MAZER,
the defendant, is listed as the President of MS Advantage in
incorporation documents, which also list MS Advantage's mailing
address as the Mazer Home Address-1.  MS Advantage has at least 7
different bank accounts at 5 different banks.  Bank records
indicate that MARK MAZER has sole signatory authority over
certain of the MS Advantage bank accounts, while SVETLANA MAZER,
the defendant, also has signatory authority over certain of MS
Advantage's bank accounts.

30.   I have learned the following about corporate, billing, and bank account information related to SCOTT BERGER, the defendant:

a.   As described above, the QA Vendor billed the City for time purportedly spent on the CityTime project by BERGER.  BERGER was characterized by the QA Vendor as a SME. BERGER was not paid directly by the QA Vendor, however.  Instead, BERGER was paid by MARK MAZER, the defendant, via MS Creative, which billed the QA Vendor for BERGER's time; the QA Vendor then marked up the amount billed by MS Creative for BERGER and passed the cost on to the City.

b.   Payments to BERGER from MS Creative were not made directly to him.  Instead, MS Creative sent funds to BERGER's corporation, "SRB Consulting, Inc." ("SRB").

c.   Bank records for SRB reflect that BERGER has received over $929,000 in City funds via MS Creative for work done as a SME on the CityTime project.

d.   SRB bank records also reflect that at the same time that BERGER was receiving money from the City for serving as an SME, purportedly supervising the Lead Software Developer's work for the City -- including work done by DAS consultants -- he was also receiving $429,000 from DAS.

31.   In addition to cash obtained by the participants in the scheme described above, certain participants in the scheme are known to have purchased expensive houses or vehicles with fraud proceeds or during the course of the conspiracy.  I and DOI continue to investigate potential purchases of assets with proceeds of the fraud or money laundering schemes described herein.  Accordingly, the following represents only a preliminary analysis of assets generated by the scheme:

a.   MARK MAZER and SVETLANA MAZER, the defendants, have purchased two homes in Manhasset, New York, with fraud proceeds — one in 2007 for $1.74 million, and one in 2009 for $1.13 million.  They have also spent over $350,000 in home renovations using fraud proceeds.

b.   Following are selected vehicles purchased by the defendants over the course of their participation in the conspiracy:

> i.    DIMITRY ARONSHTEIN, the defendant, purchased a 2009 Lexus SUV and 2009 VW Sedan.  His wife purchased a 2010 Lexus.

> ii.   SVETLANA MAZER purchased a 2009 BMW Sedan, a 2009 Acura SUV, and a 2010 Mercedes Benz SUV.

> iii.  MARK MAZER purchased a 2009 Mercedes Benz Sedan, a 2009 Lexus SUV, and a 2009 Nissan Sedan.

### 3.    Additional Evidence of Defendants' Knowing Participation in Kickback and Laundering Schemes

32.    The defendants' knowing participation in the scheme described herein is demonstrated not only by their knowing use of the complex corporate and financial structures described herein, and their enjoyment of millions of dollars of proceeds from their corrupt and illegal conduct, but also by affirmative misrepresentations and deceptive conduct by each of the participants in the scheme, including the following:

> a.    MARK MAZER, the defendant engaged in the following deceptive conduct, among other things:

> i.    MAZER submitted false VENDEX questionnaires for MS Creative.  As described above, MARK MAZER stated on the VENDEX questionnaire for MS Creative in September 2006 that he was not a principal of any company other than MS Creative and MS Properties, yet less than two months earlier, MARK MAZER had incorporated the Second-Tier Shells, and described himself as an officer of each in incorporation documents.  I believe that MARK MAZER made these misrepresentations because he intended to conceal the existence of the First-Tier and Second-Tier Shells from scrutiny to conceal the existence of the scheme and the huge proceeds he was enjoying from the scheme.

> ii.   MARK MAZER steered the Sub-Subcontractors to the City without disclosing his financial interests in the Sub-Subcontractors -- entities he was purportedly supervising -- to individuals who have thus far been interviewed by DOI.

> iii.  MARK MAZER did not disclose his familial relationship with DIMITRY ARONSHTEIN, the defendant.  DOI reviewed marriage records for both ARONSHTEIN and LARISA MEDZON, the defendants.  Both ARONSHTEIN and MEDZON reported having the same parents on separate marriage licenses that have been

reviewed by DOI, and MEDZON reported a maiden name of ARONSHTEIN in immigration-related records obtained by DOI.  In addition, bank records reflect more than $20,000 in checks from ARONSHTEIN to MARK MAZER, the defendant, in 2004, prior to the initiation of the fraud; those payments are marked "gift" on the memo lines of the checks.  Accordingly, I believe, based on this evidence, that ARONSHTEIN is MEDZON's brother, and MAZER's uncle.

                iv.   I further know from reviewing DOI's examination of bank accounts held in the name of MARK MAZER that over $1.1 million in funds were routed to these accounts from foreign banks located in known havens for money laundering activity.  It appears, based on preliminary analysis, that many of the transfers are for amounts similar to amounts sent out by ARONSHTEIN to different accounts at the same foreign banks.  Moreover, memo lines on the wire transfers purport to indicate that the transfers are made for items that are inconsistent with MARK MAZER's known business activities.  For example, on March 26, 2009, MARK MAZER and SVETLANA MAZER, via MS Advantage, received a $30,000 wire transfer from a bank account in Latvia ("Latvian Account-2") that purported to be "For Equipment Invoice Autospare Parts."  At least 70 additional wires of similar character have been received by the accounts of MARK MAZER and SVETLANA MAZER.

                v.   MARK MAZER engaged in the time sheet fraud described below to generate more money for the scheme.

           b.   SCOTT BERGER, the defendant, engaged in the following deceptive conduct, among other things:

                i.   BERGER failed to disclose that at the same time he was purportedly supervising the Lead Software Developer, he was receiving hundreds of thousands of dollars in undisclosed payments from an entity that he purported to supervise – DAS.  I believe, based on my discussions with DOI, that BERGER would not have been permitted to serve as a paid representative of both a Lead Software Developer subcontractor and as a SME charged with supervising the performance of the Lead Software Developer, had the conflict been known.

                ii.   BERGER engaged in the time sheet fraud described below to generate more money for the scheme.

           c.   ARONSHTEIN engaged in the following deceptive conduct, among other things:

         i.   As described above, ARONSHTEIN sent over $3.5 million in foreign wire transfers from DAS bank accounts. These transactions are made to companies headquartered in locations around the world that purport, from public records information, to engage in trading activities, and are made to bank accounts that are primarily known as havens for money laundering activities, including Latvia and China.  Moreover, I have spoken with an investigator from a bank headquartered in New York ("Investigator-1"), who indicated that the company using Latvian Account-1 is suspected of being a shell company that was established to facilitate money laundering activities, and that is receiving funds in round dollar amounts and distributing funds in a manner consistent with sophisticated international money laundering activities.

         ii.  ARONSHTEIN failed to disclose his secret payments to MARK MAZER, the defendant, or his familial relationship to MAZER, to any individual yet interviewed by DOI concerning the scheme, including OPA employees who interacted with MAZER and/or ARONSHTEIN on a regular basis in connection with their work on the CityTime project.

         iii. ARONSHTEIN personally transferred fraud proceeds to the First-Tier shells, demonstrating his awareness of the scheme established to launder proceeds of the fraud.  DOI analysis of bank records shows that ARONSHTEIN personally wrote over 300 checks to the three First-Tier Shells from DAS's accounts over the five years since the initiation of the scheme, alternating the shells to which the checks were written.

         iv.  ARONSHTEIN engaged in the time sheet fraud described below to generate more money for the scheme.

       d.   VICTOR NATANZON, the defendant, engaged in the following deceptive conduct, among other things:

         i.   NATANZON failed to disclose his secret payments to MARK MAZER to any individual yet interviewed by DOI concerning the scheme, including OPA employees who interacted with MAZER and/or NATANZON on a regular basis in connection with their work on the CityTime project.

         ii.  NATANZON personally transferred fraud proceeds to the First-Tier shells, demonstrating his awareness of the scheme established to launder proceeds of the fraud. NATANZON personally wrote almost 200 checks to MAS and Front Line during the relevant period.  Checks written by NATANZON appear to be in a series; they contain writing stating "1st", "2nd", "3rd",

24

etc., during the relevant period, indicating that they are being made pursuant to a coded, previously agreed-upon arrangement among participants in the scheme.  Checks include a $43,000 check to Front Line written by NATANZON in June 2010 that was cleared on or about July 7, 2010, in Front Line's bank account by LARISA MEDZON, the defendant, to facilitate the scheme described herein.

        iii. NATANZON engaged in the time sheet fraud described below to generate more money for the scheme.

        e.   MEDZON engaged in the following deceptive conduct, among other things:

        i.   LARISA MEDZON engaged in several hundred ATM transactions in the more than 10 accounts held in the names of the First-Tier Shells for which she is the signatory, at over 5 different banks.  The withdrawals follow a similar pattern: approximately every two weeks, MEDZON withdrew $500 or $1000 in cash from each of the more than 10 bank accounts, traveling to multiple banks on the same day.  Thus, for example, on January 22, 2010, MEDZON withdrew $2000 in cash from 4 bank accounts at 3 different banks in the name of Front Line.  That same day, MEDZON withdrew $2500 in cash from 4 bank accounts at 3 different banks in the name of SJM.

        ii.   MEDZON is also believed to secretly be using the MAS accounts, held in the name of CC-1, to withdraw cash and perpetrate the scheme.  Specifically, DOI obtained surveillance photos and video from a bank at which ATM withdrawals were made from MAS accounts showing that MEDZON has been withdrawing funds held in the name of MAS, even though CC-1, rather than MEDZON, is the authorized signatory on the MAS accounts.  Records reflect that also on January 22, 2010, $2000 in cash was withdrawn from MAS bank accounts at four different banks.  Withdrawals from MAS accounts often occur in the vicinity of MEDZON's home address and on the same days that MEDZON is withdrawing funds by ATM from SJM and Front Line accounts.

        iii. As a result of this practice, over $250,000 has been withdrawn in cash in close to 500 ATM withdrawals from the First-Tier Shells alone, but because MEDZON has spread the withdrawals over more than a dozen bank accounts at multiple banks in the names of the First-Tier Shell Corporations, never, according to law enforcement databases, the banks never completed a Currency Transaction Report ("CTR"), a report that must be completed whenever an individual engages in a banking transaction or series of related transactions involving $10,000 or more in cash, in connection with her withdrawal scheme.  Accordingly, I

believe that MEDZON is engaging in a sophisticated effort to avoid scrutiny from banks and law enforcement, and to avoid completing CTRs while receiving large amounts of fraud proceeds, by making large cash withdrawals that are spread among multiple banks and bank accounts.

 iv.  MEDZON also owns two of the First-Tier shells and uses these entities, as well as other bank accounts, to transfer money to participants in the scheme and their family members in a manner that disguises the true owner of the funds being transferred.

 f.  SVETLANA MAZER, the defendant, engaged in the following deceptive conduct, among other things:

 i. In June 2010, SVETLANA MAZER, the defendant, completed entity and principal VENDEX questionnaires for a preschool and kindergarten that receives substantial City funding (the "Mazer Preschool") and that SVETLANA MAZER, the defendant, owns.[7]  In the principal questionnaire, which was completed under oath, SVETLANA MAZER also failed to disclose her ownership interest and/or purported management role, per corporate and bank records, in the Second-Tier Shells, among other interests in the scheme described herein.  I believe that this failure to disclose the existence of the Second-Tier Shells represented further efforts to conceal the existence of the scheme from law enforcement.

 ii.  SVETLANA MAZER is also full or partial owner of the Second-Tier Shells.  She signed incorporation and banking documents related to the Second-Tier Shells.  Moreover, bank records reflect that she uses these entities, as well as other bank accounts in her name and the names of family members, to transfer money to participants in the scheme and their family members in a manner that disguises the true owner of the funds being transferred.  On or about September 25, 2009, SVETLANA MAZER wrote a $72,500 check to cash from MS Advantage, representing proceeds of the fraud.

---

 [7] In the questionnaire, SVETLANA MAZER discloses that MARK MAZER, the defendant, owns the land and building at the location of the Mazer Preschool through MS Properties, the company that MARK MAZER disclosed in his VENDEX questionnaire.

## The False Timesheet Fraud

### A.   Description of the Scheme

33.   In addition to establishing and using the complex financial and corporate structures set forth above to receive proceeds of the fraud, and to launder the proceeds, MARK MAZER, DIMITRY ARONSHTEIN, VICTOR NATANZON, and SCOTT BERGER, the defendants, have engaged in blatant fraud in connection with timesheets submitted for work purportedly done on CityTime (a timekeeping software program intended to, among other things, reduce fraud).   I believe that the purpose of the fraud was to inflate the size of bills submitted to the City via the Sub-Subcontractors, Contractor-1 and the Lead Software Developer, in order to increase the amount of proceeds generated by the scheme. From interviews with five consultants who worked on the CityTime Project (described herein as "Consultant-1" through "Consultant-5"), and from reviewing timesheets, billing records, invoices and other documents concerning the employment of consultants on the CityTime project, including an audit conducted by OPA in 2008, DOI learned the following concerning the scheme:

a.   Through at least the end of 2007, at the end of each week that a consultant worked on the CityTime Project, he/she was required to submit a timesheet certifying the number of hours worked each day that week (listed on a typical timesheet as "Reported Time"), and the type of work he/she had performed. The Reported Time for each day of the week, and the description of work performed during the week, was typically typed into the timesheet.   Once a timesheet was filled out and signed by the consultant, it was provided to both a supervisor and an OPA manager for approval and signature.   The approved timesheets were ultimately submitted to the City in connection with invoices seeking payment by Lead Software Developer.[8]

b.   While only a small fraction of the timesheets submitted by consultants on the CityTime Project has been analyzed thus far, and while only five of the more than 250 consultants who worked on the project have been interviewed about their submission of timesheets, DOI has nevertheless found numerous instances in which consultants were directed by defendants DIMITRY ARONSHTEIN or VICTOR NATANZON, with the

---

[8]   An example of a typical non-fraudulent timesheet is attached hereto as Exhibit A.   This timesheet was submitted by Consultant-4, referenced below, while he/she was still employed on the CityTime Project.

approval of defendants MARK MAZER and/or SCOTT BERGER, to sign
timesheets falsely certifying that work was performed when the
consultants in fact had been terminated, or were on vacation or
otherwise taking time off.

        c.   The submission of false timesheets uncovered
to date has defrauded, or attempted to defraud, the City of more
than $220,000.

**B.   Examples of the Fraud**

        34.  <u>Consultant-1</u>

        a.   DOI learned the following from interviewing
Consultant-1:

                i.   Consultant-1 was hired as a consultant
on the CityTime project by MARK MAZER and SCOTT BERGER, the
defendants, in 2005, to be paid an initial hourly rate of $20 per
hour.  Consultant-1's contract was with DAS.

                ii.  Consultant-1's timesheets listed his/her
supervisor as SCOTT BERGER, the defendant, but in reality he/she
reported to MARK MAZER.

                iii. During his/her employment, Consultant-1
helped process timesheets for other consultants.  He/she faxed
filled-out timesheets to DIMITRY ARONSHTEIN, the defendant, at
DAS, and copies were also sent to OPA.  Consultant-1 witnessed
several instances in which timesheets were submitted certifying
that work had been performed, even though the consultants had
been on vacation or had left their positions.  In one such
instance, Consultant-1 received timesheets certifying that work
had been performed by another consultant for two months after
that consultant had been terminated.

                iv.  In early 2007, Consultant-1 was asked to
meet with ARONSHTEIN at the office of DAS.  At that meeting,
ARONSHTEIN informed Consultant-1 that he/she was being fired, and
instructed Consultant-1 that if he/she wanted to receive
severance pay, he/she had to sign two weeks' worth of new
timesheets.  Following these instructions, Consultant-1 filled
out and signed two timesheets and gave them to ARONSHTEIN.

        b.   From reviewing timesheets submitted by
Consultant-1 in late 2006 and early 2007, I have learned that
on the timesheets submitted prior to Consultant-1's termination,
Consultant-1's signature is typically dated within one to three

days of the last date of the weekly reporting period.   After
Consultant-1 had been terminated, two timesheets were submitted,
but without any date listed next to his/her signature.   The first
such timesheet, which falsely certified that 32 hours of work had
been performed that week, was initialed by MARK MAZER and
approved and signed by BERGER as "Supervisor."   The second such
timesheet, which falsely certified that 40 hours of work had been
performed that week, was approved and signed by MARK MAZER as
"Supervisor."

      c.    From reviewing billing records related to
Consultant-1's employment, I have learned that the Lead Software
Developer billed the City $163.47 for each hour of Consultant-1's
time.   Accordingly, the intended loss to the City for the 72
hours of Consultant-1's false time approved by MARK MAZER and
BERGER equals $11,769.84.   Both of the false timesheets signed by
Consultant-1 were submitted by the Lead Software Developer to the
City in connection with Lead Software Developer's invoices
seeking payment.

     35.  Consultant-2

      a.    DOI learned the following from interviewing
Consultant-2:

      i.    Consultant-2 was hired as a consultant
on the CityTime project by MARK MAZER, the defendant, in 2005.
Consultant-2 was paid $70 per hour, and was told by MARK MAZER
that he/she would be paid by DAS.

      ii.    During his/her employment, Consultant-2
and several other consultants began using the CityTime
hand-scanning device (called "DCD," for Data Collection Device)
to track their time, just as employees for agencies across New
York City were being asked to do as part of the implementation of
CityTime.   After another consultant complained to MARK MAZER
about this practice, on the ground that the DCDs would not permit
him/her to bill for time spent on vacation or out of the office,
MARK MAZER instructed Consultant-2 and others to immediately stop
using the DCDs.

      iii. Consultant-2 was aware of other
consultants working on the CityTime Project who took paid days
off while submitting timesheets certifying falsely that they had
been working, and he/she was aware that SCOTT BERGER, the
defendant, had approved and signed such timesheets.   BERGER told
Consultant-2 that he discussed this practice with MARK MAZER and
that MARK MAZER approved of it.

iv.  In early 2007, Consultant-2 was told to attend a meeting at the office of DAS.  At that meeting, DIMITRY ARONSHTEIN, the defendant, informed Consultant-2 that he/she was being terminated immediately.  ARONSHTEIN then instructed Consultant-2 that if he/she wanted to receive severance pay, Consultant-2 had to sign blank timesheets.  Following these instructions, Consultant-2 filled out and signed blank timesheets and gave them to ARONSHTEIN.  Several weeks later, Consultant-2 received a severance check from DAS.

b.  From reviewing timesheets submitted by Consultant-2 in late 2006 and early 2007, I have learned that after Consultant-2 had been terminated, two timesheets were submitted, each certifying that 40 hours of work for the specified week had been performed.  On both of these timesheets, the dates and hours worked are filled in by hand – instead of being typed as they were on Consultant-2's previous timesheets – and the list of work activities is unchanged from the list included on the last timesheet submitted prior to Consultant-2's termination.  MARK MAZER approved and signed the first of these timesheets as "Supervisor," and BERGER approved and signed the second timesheet, also as "Supervisor."[9]

c.  From reviewing billing records related to Consultant-2's employment, I have learned that in early 2007, the Lead Software Developer billed the City of New York $163.47 for each hour of Consultant-2's time.  Accordingly, the intended loss to the City of New York for the 80 hours of Consultant-2's false time approved by MARK MAZER and SCOTT BERGER equals $13,077.60.[10]

36.  <u>Consultant-3</u>

a.  DOI learned the following from interviewing Consultant-3:

i.  Consultant-3 was hired as a consultant on the CityTime Project by VICTOR NATANZON, the defendant, in the spring of 2007, at an annual salary of $60,000.  NATANZON told Consultant-3 that he/she would be an employee of Prime View.

---

[9] Copies of the false timesheets submitted by Consultant-2 are attached hereto as Exhibit B.

[10] According to invoices reviewed by DOI, at least one of Consultant-2's false timesheets was submitted by the Lead Software Developer to the City for payment.

      ii.   After just four weeks of working on the CityTime Project, Consultant-3's employment was terminated.   On the day he/she was terminated, NATANZON instructed him/her that if he/she wanted to receive severance pay, he/she had to sign blank timesheets.   Following these instructions, Consultant-3 filled out and signed blank timesheets and gave them to NATANZON. He/she subsequently received a severance check from Prime View.

      b.   From reviewing timesheets submitted by Consultant-3 and related employment records, I have learned that Consultant-3 was terminated on a Thursday.   That day, Consultant-3 signed three time sheets.   The first, which covered the week of his/her termination, reported a total of 40 hours of work performed, including 8 hours for the Friday after he/she had been terminated.   The second and third timesheets, which covered the two weeks following his/her termination, also reported 40 hours per week of work performed.   Accordingly, a total of at least 88 hours of work was reported that was not performed.   On each of the three timesheets at issue, the dates and hours worked are filled in by hand instead of being typed as they had been on previous timesheets submitted by Consultant-3, and the list of work activities is left blank.   MARK MAZER, the defendant, approved and signed the first of these timesheets as "OPA Manager."   SCOTT BERGER, the defendant, approved and signed the second and third timesheets, as both "Supervisor" and "OPA Manager."

      c.   From reviewing billing and related records concerning Consultant-3's employment, I have learned the following:

      i.   MARK MAZER requested that Consultant-3 be hired.

      ii.   The City was billed by the Lead Software Developer $123.13 for each hour of Consultant-3's time. Accordingly, the intended loss to the City for the 88 hours of Consultant-3's false time approved by MARK MAZER and BERGER equals $10,835.44.[11]

      iii. The false time sheets signed by Consultant-3 and approved by MARK MAZER and BERGER were brought to the attention of a different supervisor shortly after they

_____

    [11] DOI is continuing to attempt to verify whether Consultant-3's false timesheets were in fact submitted by the Lead Software Developer to the City for payment.

were submitted.  That supervisor stated, in an email: "I have not received these time reports.  I would not have signed them."

37.  Consultant-4

a.  DOI learned the following from interviewing Consultant-4:

i.  Consultant-4 was hired as a consultant on the CityTime Project by VICTOR NATANZON, the defendant, in early 2007, to be paid an hourly rate of $46 per hour.  NATANZON told Consultant-4 that he/she would be an employee of Prime View.

ii.  In the summer of 2007, Consultant-4 was told to attend a meeting with NATANZON.  At that meeting, NATANZON informed Consultant-4 that he/she was being terminated immediately, and instructed him/her that if he/she wanted to receive severance pay, he/she had to sign blank timesheets.  Following these instructions, Consultant-4 filled out and signed blank timesheets and gave them to NATANZON.  He/she subsequently received a severance check from Prime View.

b.  From reviewing timesheets submitted by Consultant-4 in 2007, I have learned that after Consultant-4 had been terminated, two timesheets were submitted, each certifying that 40 hours of work for the specified week had been performed. On both of these timesheets, the dates and hours worked are filled in by hand instead of being typed as they had been on previous timesheets submitted by Consultant-4, and the list of work activities is left blank.  SCOTT BERGER, the defendant, approved and signed both of these timesheets as "Supervisor," and MARK MAZER, the defendant, approved and signed both of these timesheets as "OPA Manager."[12]

c.  From reviewing billing records related to Consultant-4's employment, I have learned that the Lead Software Developer billed the City $175 for each hour of Consultant-4's time.  Accordingly, the intended loss to the City for the 80 hours of Consultant-4's false time approved by MARK MAZER and BERGER equals $14,000.  Both of the false timesheets signed by Consultant-4 were submitted by the Lead Software Developer to the City for payment.

---

[12] An example of one of Consultant-4's false timesheets, submitted after his/her termination, is attached hereto as Exhibit C, and can be compared for reference to Exhibit A, which was submitted by Consultant-4 prior to his/her termination.

38.  Consultant-5

a.    From reviewing billing records, timesheets, other employment records, and travel documents concerning Consultant-5, a consultant who has worked on the CityTime project from 2005 to the present, I have learned the following:

i.    Consultant-5 signed a contract with DAS in 2005 to perform consulting work on the CityTime project.  The contract provided that Consultant-5 would be paid $45 per hour for all hours worked, including overtime hours.  The hourly rate was gradually increased over time.  As of on or about September 30, 2010, when Consultant 5 was terminated as part of a large group of consultants being phased out of the project, her rate was $73.15.

ii.    From 2005 through the end of 2007, the City was billed $124.43 per hour for Consultant-5's time.  That rate increased to $156.41 per hour in 2008, and to $164.23 per hour in 2009.  Between 2005 and 2009, the City of New York was billed more than $1.2 million for work performed by Consultant-5.

iii. On at least six separate occasions between 2005 and 2009, Consultant-5 traveled overseas, for a total of more than 9 weeks of time away from his/her consulting job.  On or after each of those occasions, false timesheets were submitted in Consultant-5's name reflecting that he/she had performed work when he/she was, in fact, overseas.  Eight of the false time sheets were signed or initialed by MARK MAZER, the defendant.

b.    According to invoices reviewed by DOI, most, if not all, of the false timesheets from Consultant-5 were submitted to the City for payment.  The total loss to the City for the more than 180 hours of Consultant-5's falsely billed time exceeds $25,000.

c.    Consultant-5 admitted when interviewed by DOI that he/she did not do any work for CityTime while on vacation overseas.

d.    From interviewing several other individuals who served as consultants or managers on the CityTime project, DOI learned that Consultant-5 had a close relationship with MARK MAZER.  DOI also has reviewed emails between MARK MAZER and Consultant-5 that show that, on at least one occasion, MARK MAZER knew that Consultant-5 had been overseas prior to his approving of Consultant-5's timesheet for that period.

33

39.   The OPA Audit

        a.   In or about July 2008, OPA conducted an audit
of paper records maintained in connection with the CityTime
project to determine whether consultants paid from a certain work
order billed through the Lead Software Developer contract
submitted timesheets for services after they were terminated, and
if the contractor and consultant received payments for such
services (the "OPA Audit").  The audit examined the timesheets of
31 consultants who had been terminated in 2007.  Of those, there
were nine instances - nearly one-third of the total - in which
the consultant's last date of work on an approved timesheet was
after the consultant had been terminated.[13]  In most of the
instances identified by the OPA Audit, two or more weeks of false
timesheets were submitted following a consultant's termination;
in one instance, ten weeks of false timesheets were submitted.
In total, the OPA Audit report found that more than 890 hours of
time had been improperly submitted to the City for payment, not
including the time submitted by Consultant-2.

        b.   The OPA Audit report did not reach a
conclusion as to whether the false timesheets were the product of
a fraud.  It also did not identify who had approved of the false
timesheets, or whether the consultants involved had been directed
to submit them.  The report's only comment in this regard was as
follows: "There are checks and balances (Manager's, CityTime
Contract Management, and Contractor) according to the procedures
for which this situation should not have occurred."  The report
also did not include the billing rates of the consultants
involved, and did not attempt to quantify the total loss to the
City as a result of being billed for time after consultants had
been terminated.

        c.   As part of DOI's ongoing investigation, DOI
independently obtained documents from OPA reflecting the rates
that the City was billed for the consultants identified in the
OPA Audit report.  DOI also reviewed the false timesheets that
had been submitted to the City, as well as other documents
concerning the employment of the consultants identified in the
OPA Audit report.  DOI learned that each one of the false
timesheets submitted by consultants identified in the OPA Audit
report were approved and signed by MARK MAZER and/or SCOTT

---

        [13]  One of the nine instances examined by the audit involved
Consultant-2.  The timesheets of the other consultants discussed
above are not identified in the OPA Audit report.

BERGER, the defendants, and that all, or nearly all, of the consultants were paid through either DAS or Prime View.  DOI also learned that the City was billed between $124.13 per hour and $255.81 per hour for the false time submitted.  Based on these rates, the total loss to the City for the false time submitted by the consultants identified in the OPA Audit report (not including Consultant-2) exceeds $145,000.

WHEREFORE, deponent respectfully requests that warrants be issued for the arrests of MARK MAZER, DIMITRY ARONSHTEIN, VICTOR NATANZON, SCOTT BERGER, SVETLANA MAZER, and LARISA MEDZON, the defendants, and that they be imprisoned or bailed, as the case may be.

_____
ROBERT RYAN
Criminal Investigator
USAO-SDNY

Sworn to before me this
14th day of December 2010

_____
THE HONORABLE HENRY B. PITMAN
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK

35

## CityTime Status Report



**Client:** City of New York, OPA
**Project:** CityTime
**Contractor:** ███
**Job Code #:**06-5126-30-2250-681

**Period Covered: 06/30/07 – 07/06/07**
**Consultant:** ███████
**Supervisor:** Scott Berger
**Manager:** Mark Mazer

| Type | | Description |
|---|---|---|
| **Meeting** | 03 July, 2007 15:00 – 16:00 | WFM overview |
| **Activities** | 05 July, 2007 14:00 – 16:00 | CityTime training |
| **Deliverables** | | |

Help Desk Management, Planning, Conference calls

| Day | Date | Hours |
|---|---|---|
| **Saturday** | 06/30/07 | 0.00 |
| **Sunday** | 07/01/07 | 1.00 |
| **Monday** | 07/02/07 | 8.00 |
| **Tuesday** | 07/03/07 | 8.00 |
| **Wednesday** | 07/04/07 | 0.00 |
| **Thursday** | 07/05/07 | 8.00 |
| **Friday** | 07/06/07 | 8.00 |
| **Total Hours** | | **33.00** |

I, ██████████ certify that the above information is accurate and complete.

Consultant's Signature: ██████████  Date: 7/9/07

Supervisor's Signature: _____  Date: 7/8/07

Manager's Signature: _____  Date: 7/9/07



# CityTime Status Report



**Client:** City of New York. OPA

**Project:** CityTime

**Contractor:** ████

Job Code#:06-5126-30-2250-680

**Period Covered:** 1/20-1/26/07

**Consultant:** ████████

**Supervisor:** Scott Berger

**OPA Manager:** ████████

## Type

Meetings
Meetings
Meetings
Meetings
Meetings
Meetings

Meetings
Meetings
Activities

Activities

Activities

Activities

## Description

Environment Availability
Implantation Meeting
3.0 Functionality Review
DOHMH Status Update
Remedy Asset Management

Remedy Asset Reports
Remedy Work Flow
Configuring Crystal Reports for Remedy
Activity Checks with DoITT after Maintenance
Provide User Support for SI NYPD Prod

## Reported Time

| Day | Date | | | Hours |
|-----|------|---|---|-------|
| Saturday | 1 | 20 | 07 | 0.00 |
| Sunday | 1 | 21 | 07 | 0.00 |
| Monday | 1 | 22 | 07 | 8.00 |
| Tuesday | 1 | 23 | 07 | 8.00 |
| Wednesday | 1 | 24 | 07 | 8.00 |
| Thursday | 1 | 25 | 07 | 8.00 |
| Friday | 1 | 26 | 07 | 8.00 |
| Total Hours | | | | 8.00 |

40

I, ████ certify that the above information is accurate and complete.

**Consultant's Signature:** ████████   **Date:** 1/26/2007

**Supervisor's Signature:** _Mark Mazer_   **Date:** 1/29/07

**OPA Manager's Signature:** ████████   **Date:** 1/29/01

FEB  2007  18:01                                                                              P.02



Client:  City of New York, OPA          Period Covered: 1/27/07 - 2/2/07

Project: CityTime                       Consultant: ▮▮▮▮▮▮▮▮▮

Contractor: ▮▮▮▮                        Supervisor: Scott Berger

Job Code#:06-5126-30-2250-680          OPA Manager: ▮▮▮▮▮▮▮▮

**Type**                                **Description**

Meetings            Environment Availability
Meetings            Implantation Meeting
Meetings            3.0 Functionality Review
Meetings            DOHMH Status Update
Meetings            Remedy Asset Management
Meetings

Meetings            Remedy Asset Reports
Meetings            Remedy Work Flow
Activities          Configuring Crystal Reports for Remedy
Activities          Activity Checks with DoITT after Maintenance
Activities          Provide User Support for SI NYPD  Prod

Activities

Reported Time

| Day | Date | | | Hours |
|-----|------|---|---|-------|
| Saturday | 1 | 27 | 07 | 0.00 |
| Sunday | 1 | 28 | 07 | 0.00 |
| Monday | 1 | 29 | 07 | 8.00 |
| Tuesday | 1 | 30 | 07 | 8.00 |
| Wednesday | 1 | 31 | 07 | 8.00 |
| Thursday | 2 | 01 | 07 | 8.00 |
| Friday | 2 | 02 | 07 | 8.00 |
| Total Hours | | | | |

**40**

I, ▮▮▮▮▮▮ , certify that the above information is accurate and complete.

Consultant's Signature: ▮▮▮▮▮▮▮         Date: 2/02/07

Supervisor's Signature: _Scott Berger_   Date: 2/6/07

OPA Manager's Signature: ▮▮▮▮▮          Date: 2/6/07

Page1



### City Time Status Report



**Client:** City of New York, OPA

**Project:** City Time

**Contractor:** ████

**Period Covered:** 7/21/07 - 7/27/07

**Consultant:** ████

**Supervisor:** Skott Burger

**OPA Manager:** Marc Mates

Job Code: 06-5126-30-2250-681

| | Type | Description |
|---|---|---|
| Meetings | | |
| Activities | | |
| Deliverables | | |

**Reported Time**

| Day | Date | Hours |
|---|---|---|
| Saturday | 7/21 | 0.00 |
| Sunday | 7/22 | 0.00 |
| Monday | 7/23 | 8.00 |
| Tuesday | 7/24 | 8.00 |
| Wednesday | 7/25 | 8.00 |
| Thursday | 7/26 | 8.00 |
| Friday | 7/27 | 8.00 |
| **Total Hours** | | 40 Hrs |

I, ████, certify that the above information is accurate and complete.

**Consultant's Signature:** ████  **Date:** 7/12/07

**Supervisor's Signature:** _Scott Burger_  **Date:** 7/13/07

**OPA Manager's Signature:** _Marc Mates_  **Date:** 7/27/07